**REVERSE and RENDER in part; AFFIRM and Opinion Filed January 13, 2023**



**In the**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-21-00992-CV**

**IN THE INTEREST OF M.M. AND M.M., CHILDREN**

**On Appeal from the 470th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 470-57144-2018**

## MEMORANDUM OPINION
Before Justices Carlyle, Garcia, and Rosenberg[1]
Opinion by Justice Carlyle

In this suit affecting the parent–child relationship, Father appeals the trial court's final order on his and Mother's (1) cross-motions to enforce their divorce decree and (2) cross-petitions to modify possession and access regarding their two children. We affirm in part and reverse in part in this memorandum opinion. *See* TEX. R APP. P. 47.4.

**Background**

---

[1] The Hon. Barbara Rosenberg, Justice, Assigned.

On September 19, 2019, Father and Mother signed an agreed final decree of divorce that appointed them joint managing conservators of the children, with Mother having the exclusive right to designate the children's primary residence and receive child support. The decree gave Father possession of the children every other weekend, on Thursdays during the regular school term, on certain holidays, for several weeks during the summer, and during the school's spring vacation in even-numbered years.

The decree stated both parties shall have, among other things, "the right to consent for the children to medical and dental care not involving an invasive procedure"; "the independent right, subject to prior meaningful consultation with the other parent conservator, to consent to medical, dental, and surgical treatment involving invasive procedures"; "the right to receive information from any other conservator of the children concerning the health, education, and welfare of the children"; "the right of access to medical, dental, psychological, and educational records of the children"; "the right to consult with a physician, dentist, or psychologist of the children"; and "the duty to inform the other conservator of the children in timely manner of significant information concerning the health, education, and welfare of the children."

On May 13, 2020, Mother filed a "Motion for Enforcement of Possession" alleging the children "were not returned to Mother at 6:00 p.m. on Sunday, March 15, 2020, following the end of Spring Break possession by [Father]" and Father

–2–

"kept the children in violation of the [divorce decree] from March 15, 2020, until March 22, 2020." Mother requested, among other things, additional periods of possession to compensate for Father's actions and that she be awarded attorney's fees. Mother attached a copy of a March 17, 2020 emergency standing order issued by the Collin County District Courts stating that in Collin County suits affecting the parent–child relationship, (1) "[p]ossession and access shall not be affected by the school's closure that arises from an epidemic or pandemic, including but not limited to, what is commonly referred to as the COVID-19 pandemic," and (2) "[i]f a person had possession of the child for Spring Break, but the school has cancelled classes for the week following Spring Break, that person is NOT entitled to possession of the child" and "MUST return the child as if school had resumed following the Spring Break vacation as set out in the original published school schedule."

Father filed an answer denying Mother's allegations. Additionally, he filed a July 16, 2020 motion to enforce the decree's provisions regarding medical expenses and information sharing. He contended Mother violated the decree by (1) failing to maintain the required health insurance coverage for the children during several months in 2019; (2) failing to furnish Father with the information necessary to submit a claim under the children's health insurance policy; and (3) "failing to pay her portion of the uninsured health care expenses of [the children] since April 4, 2020." He also asserted Mother "fail[ed] to notify Father via the Our Family Wizard website" regarding the children's scheduled activities and several medical

–3–

appointments, including an appointment pertaining to the older child's ongoing asthma treatment.

While those motions to enforce were pending, Father filed an August 5, 2020 petition to modify the divorce decree. He asserted that "the terms and conditions for possession of or access to the children as well as the relative rights and duties of the conservators should be changed" and requested that the trial court terminate his child support obligation and order Mother to pay child support to him.

Mother generally denied Father's allegations and requested defensive attorney's fees. Additionally, Mother filed an August 28, 2020 "Counterpetition to Modify Parent–Child Relationship," asserting:

> Pursuant to section 261.107 of the Texas Family Code, the Court should find that [Father], with the intent to deceive, knowingly made one or more false or lacking factual foundation reports of child abuse to CPS.
>
> There is a history or pattern of child neglect committed by [Father]. [Mother] requests the Court to deny [Father] access to the children. Alternatively, [Mother] requests that the Court render a possession order that provides that [Father's] periods of visitation be continuously supervised by an entity or person chosen by the Court.
>
> [Mother] requests the Court to appoint a parenting facilitator. There is good cause for appointment of a parenting facilitator, and the appointment would be in the best interest of the children.

The counterpetition also (1) contended the support payments previously ordered "are not in substantial compliance with the guidelines in chapter 154 of the Texas Family Code" and should be increased, and (2) requested that Father be ordered to pay Mother's reasonable attorney's fees, expenses, and costs through trial and appeal. In October 2020, the trial court appointed a parent facilitator.

–4–

Father generally denied Mother's allegations and filed a July 26, 2021 "First Amended Petition to Modify Parent–Child Relationship." He requested that the trial court (1) "consider that there is a history or pattern of child neglect committed by [Mother] and limit [Mother's] periods of possession to no more than 3 consecutive days"; (2) appoint him "as sole managing conservator or, in the alternative, as the joint managing conservator with the exclusive right to determine the primary residence of [the children]"; (3) order Mother to provide support for the children; (4) order "reasonable periods of electronic communication between the children and [Father] to supplement [Father's] periods of possession of the children"; and (5) award him reasonable attorney's fees, expenses, and costs through trial and appeal.

On July 30, 2021, Mother filed an amended counterpetition restating her above-described requests and asking, among other things, that she be given "the exclusive rights to consent to medical, dental, and surgical treatment involving invasive procedures." She also asked the trial court to permanently enjoin Father from (1) "[c]oming within 500 feet of [her] residence . . . except for the purpose of exchanging the children the subject of this suit"; (2) "[d]uring the exchanges, coming onto [Mother's] private property, such as her yard or sidewalk"; (3) "[a]ppearing at [Mother's] residence for any reason, including but not limited to picking up and dropping off the children's items, except for the exchange of the children"; (4) "[c]ancelling health care appointments for the children made by the other

–5–

parent"; (5) "[f]ailing to inform [Mother] of any healthcare appointment for the children"; and (6) "failing to initiate Zoom or other electronic communication if [Mother] cannot attend the healthcare appointment."

Additionally, Mother amended her motion for enforcement to include requests that the trial court (1) compel Father to pay his portion of the appointed parent facilitator's fees and (2) hold Father in contempt and order him jailed and fined for failing to pay his share of various healthcare expenses under the decree. Then, Father amended his motion for enforcement to include requests that Mother be held in contempt, jailed, and fined for her alleged violations described above.

At the September 8, 2021 bench trial, Dr. Aaron Robb testified he was appointed as a parenting facilitator in this case in October 2020. As part of that role, he investigated Father's multiple complaints to CPS[2] that Mother was "medically neglecting" the children. Based on his investigation, he had no concerns that Mother had medically neglected the children. He stated he explained to Father that "Mom was doing things slightly differently than Dad at one point" but "different doesn't necessarily mean wrong, and both CPS and the treating physician saw Mom as —as acting as directed." He testified Father was not "receptive to" his conclusions and "continued to insist that Mom was not appropriately caring for the children."

---

[2] The record shows the parties and the trial court used the term "CPS" to refer to the Texas Department of Family and Protective Services.

Dr. Robb also testified he believed Father's communication with the children "involved adult issues" and the children "were being probed for information about their mother." His report stated the children "have been treated less as children and more as . . . tools to harm, control, or otherwise continue emotional entanglements of some sort with the mother," which could result in "not only immediately emotional harm but long-term emotional harm" to the children. He stated Father (1) appeared to be "stalking the mother"; (2) had acknowledged communicating with the children through their bedroom window while in the bushes outside Mother's house; (3) was "treating the mother as the enemy" and as "someone who . . . needs to be fought with rather than co-parented with"; and (4) was interfering with the children's appointments with their physicians by cancelling appointments Mother had made. When Dr. Robb tried to work with Father to "utilize different approaches," Father told him "that he was gonna keep doing what he was doing and that was essentially the right way to handle things." Dr. Robb testified he "had significant concerns that Father's lack of insight was going to lead to long-term harm for the children."

On cross-examination, Dr. Robb testified the children's medical records showed that a physician assistant had "provided certain information" to the parents that the children's physician "later corrected" regarding the inhaler mechanism used to administer the older child's asthma medication. Dr. Robb stated the children's

physician had "stressed" to him that though Mother and Father were using different inhaler mechanisms to administer the child's medication, "[d]ifferent isn't wrong."

On redirect examination, Dr. Robb stated that the "gist of the dispute" regarding the inhalers was that "Mom got a generic inhaler" and Father "had the nongeneric form." Father "told the children Mom's medication was bad."

Jamayla Burse, a Texas Department of Family and Protective Services caseworker, testified Father filed five reports with the Department alleging Mother's medical neglect of the children. Ms. Burse was assigned to investigate the fourth report. She spoke with the children's asthma doctor and found no reason to believe Mother had done anything wrong. Ms. Burse communicated the Department's finding to Father and "referred him to go back to the doctor" with any additional questions regarding "what Mom was doing."

Ms. Burse stated she also gave Mother the Department's "domestic violence safety plan" because Mother told her she was not comfortable with both parents attending the children's doctor visits together "and didn't feel comfortable co-parenting due to concerns about her safety with [Father]." According to Ms. Burse, Mother "elaborated further about incidences of [Father] showing up to the home" and told her "[t]here had been moments where she felt like he was angry and enraged." Ms. Burse also stated that based on her investigation, she was "concerned that [the children] were being told information that put them in the middle of policing what was happening at Mom's house and . . . reporting back."

Father testified that in February 2020, Mother began using an AirDuo brand of inhaler to administer the older child's asthma medication instead of the Advair brand both parties had previously used. He stated that a "spacer" the doctor had told them to use on the Advair inhaler helps "push" out the medication, but no spacer can be used on the AirDuo inhaler. He testified that as a result, the child "wasn't getting enough medication in her system." He stated, "The physician at that time sent a letter home, gave me a copy, and gave another copy and also attached it to Our Family Wizard as well to basically say that she can't use the AirDuo because she has to suck out that medication and basically she can't." Father testified he believes the CPS complaints he made were "legitimate."

Father stated he has stood outside the window at Mother's home in the evening "twice maybe" to tell the children goodnight and tell them he loves them because Mother "refuses to let me talk to the kids." Mother called the police on one of those occasions "but they didn't file anything." He testified that when he returns the children to Mother after their visits with him, they cry and "refuse to go back."

Mother testified she switched to the AirDuo inhaler because it was a generic inhaler that was less expensive and the children's physician prescribed it. She stated the physician "repeatedly" told her the generic inhaler "was fine," both before and after the physician assistant's letter recommending the Advair inhaler. She also testified (1) the children told her Father has come to their window at her home "a lot" and it has "been going on for a long time"; (2) he has visited her home uninvited

on multiple other occasions, sometimes banging on the door and yelling, which prompted her to install security cameras; (3) he gave the children a cell phone and instructed them to hide it from her; (4) he told the children in phone calls "to hold on, it's not that much longer, you know what to do"; (5) he undermined the parent facilitator process by refusing to pay Dr. Robb and filing a disciplinary complaint against him; and (6) she is concerned about the safety and welfare of the children if Father is allowed unsupervised possession.

The documents admitted into evidence showed Father filed CPS reports on April 10, 2020; May 22, 2020; June 7, 2020; July 8, 2020; and August 14, 2020, all of which alleged medical negligence by Mother and were closed based on findings of no dangers or safety concerns. The evidence also included (1) an April 2020 physician assistant's letter to Mother and Father recommending the use of the Advair inhaler rather than the AirDuo inhaler for the older child's asthma treatment; (2) Dr. Robb's January 2021 report to the trial court; (3) a March 12, 2020 notice from the children's school district extending spring break to include March 16–20 due to COVID-19; (4) email communications between the parties; and (5) medical records and receipts, including an October 2020 asthma "Action Plan" for the older child stating that either Advair or AirDuo inhalers can be used for treatment.

Following trial, the trial court signed a September 8, 2021 letter ruling that stated, among other things:

The decree remains in effect except as specifically modified:

## Communication

The court finds that the father cannot coparent or effectively communicate with the mother. The following modifications are the court's effort to implement completely separate parenting.

The court finds that coparenting communication is not effective and is not in the children's best interest. The parents are not to communicate at all with each other. If any communication is absolutely necessary, the parents may only communicate via U.S. mail.

Neither parent will have any duty to inform or consult with the other parent, except that both parents shall retain the duties to inform the parent if they reside with a sex offender or a person who is the subject of a protective order.

The parents may not communicate in any manner with the children during the other parent's time.

Each parent is prohibited from tracking, monitoring, or recording the children while in the other parent's possession.

Each parent is prohibited from going within 500 feet of the other parent's house.

Neither parent may cancel or attend appointments for the children that occur during the other parent's possession periods.

## Possession Schedule

Mother is awarded 7 days of makeup time, which will begin on 12/28/2021 at noon and end on 1/4/2022 at noon.

. . . .

## Child Support

Father's child support is modified effective 9/1/2020 to $788.47 per month for 2 children and $630.77 per month for 1 child.

Father's cash medical support is modified to $260 per month effective 1/1/2021.

. . . .

## Enforcement

No contempt.

Mother owes father $490.85 for unreimbursed medical expenses.

Father owes mother $1,353.13 for parenting facilitation, which is $862.28 net, after offsetting the unreimbursed medical expenses mother owes.

Father owes mother $319.77 for unreimbursed medical expenses.

Net judgments: Father owes mother $319.77 as additional child support and father owes a judgment for $862.28 for parenting facilitation.

## Attorney Fees

Mother is granted a judgment against father for attorney fees in the amount of $10,524.96 + $1,725 + $34,183.50 = $46,433.46 as of 9/8/2021 bearing interest at the judgment rate of 5%.

## CPS Reports - Findings

The father acted in bad faith and with malicious purpose in reporting alleged child abuse or neglect.

The father's reports made under Ch. 261 were false and lacking factual foundation. The court therefore modified an order providing for possession of or access to the child who was the subject of the report by restricting further access to the child by the person who made the report.

The court has ordered the father to pay the reasonable attorney's fees incurred by the mother who was falsely accused of abuse or neglect in the proceedings relating to the false report.

The trial court signed an October 7, 2021 final order that incorporated those rulings.

## The trial court did not err by modifying Father's possession and access

In his first issue, Father contends the trial court erred by modifying his possession and access because (1) Mother lacked standing to bring a claim under family code Chapter 261 and thus the trial court lacked jurisdiction to modify the decree pursuant to that chapter; (2) "no or insufficient evidence exists that Father made a false report that lacked factual foundation"; and (3) it was not in the children's best interest "to completely cutoff communication between the parents or to prevent them from attending the children's medical appointments." We address these contentions in turn.

### *Standing*

–12–

Standing is a component of subject matter jurisdiction and is a constitutional prerequisite to maintaining a lawsuit under Texas law. *In re M.K.S.–V.*, 301 S.W.3d 460, 463 (Tex. App.—Dallas 2009, pet. denied). When standing has been statutorily conferred, the statute itself serves as the proper framework for a standing analysis. *See, e.g.*, *Everett v. TK–Taito, L.L.C.*, 178 S.W.3d 844, 851 (Tex. App.—Fort Worth 2005, no pet.). "When interpreting statutes, we look to the plain meaning of the enacted text. We must enforce the statute as written and refrain from rewriting text that lawmakers chose." *KMS Retail Rowlett, LP v. City of Rowlett*, 593 S.W.3d 175, 183 (Tex. 2019) (cleaned up). To the extent the issue of standing turns on the construction of relevant statutes, we apply a de novo standard of review. *E.g.*, *Jasek v. Tex. Dep't of Family & Protective Servs.*, 348 S.W.3d 523, 528 (Tex. App.—Austin 2011, no pet.).

The family code's Title 5, which governs "The Parent–Child Relationship and the Suit Affecting the Parent–Child Relationship," provides that courts generally acquire "continuing, exclusive jurisdiction over the matters provided for by this title in connection with a child on the rendition of a final order." TEX. FAM. CODE § 155.001(a). Title 5's Chapter 261, titled "Investigation of Report of Child Abuse or Neglect," requires persons "having cause to believe that a child's physical or mental health or welfare has been adversely affected by abuse or neglect by any person" to make a report to the Texas Department of Family and Protective Services. *Id.* § 261.101. Section 261.107 of that chapter states:

(a) A person commits an offense if, with the intent to deceive, the person knowingly makes a report as provided in this chapter that is false. An offense under this subsection is a state jail felony unless it is shown on the trial of the offense that the person has previously been convicted under this section, in which case the offense is a felony of the third degree.

(b) A finding by a court in a suit affecting the parent-child relationship that a report made under this chapter before or during the suit was false or lacking factual foundation may be grounds for the court to modify an order providing for possession of or access to the child who was the subject of the report by restricting further access to the child by the person who made the report.

(c) The appropriate county prosecuting attorney shall be responsible for the prosecution of an offense under this section.

(d) The court shall order a person who is convicted of an offense under Subsection (a) to pay any reasonable attorney's fees incurred by the person who was falsely accused of abuse or neglect in any proceeding relating to the false report.

(e) A person who engages in conduct described by Subsection (a) is liable to the state for a civil penalty of $1,000. The attorney general shall bring an action to recover a civil penalty authorized by this subsection.

*Id.* § 261.107.

Here, Father asserts section 261.107 provides a ground to modify "only when the appropriate county prosecuting attorney filed suit against a party who has filed a false report of alleged child abuse and a finding of that offense exists." We disagree.

To the extent Father contends the trial court improperly "implicated" subsection 261.107(b), the statute's plain language undermines that position. Though other subsections of section 261.107 pertain to prosecution of an offense by the

–14–

county prosecuting attorney or, in the case of subsection (e), specifically reference those provisions, nothing in subsection (b) mentions or refers to a prosecution or in any way limits that subsection to suits involving prosecutions. Instead, subsection (b) statutorily recognizes a basis—"[a] finding by a court in a suit affecting the parent-child relationship that a report made under this chapter before or during the suit was false or lacking factual foundation"—to support modifying "an order providing for possession of or access to the child who was the subject of the report by restricting further access to the child by the person who made the report." Based on subsection 261.107(b)'s plain language, we conclude the trial court did not err by determining that a finding pursuant to that provision constituted a proper ground for its modification of the divorce decree.[3] *See* TEX. FAM. CODE § 261.107(b); *KMS Retail*, 593 S.W.3d at 183.

### *Evidentiary sufficiency and children's best interest*

We review a trial court's order modifying possession or access under an abuse-of-discretion standard. *See Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); *Zeifman v. Michels*, 212 S.W.3d 582, 587 (Tex. App.—Austin 2006, pet. denied); *see also Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985)

---

[3] The two cases Father relies on did not involve subsection (b) and thus are inapposite. *See Colt v. Hamner*, No. 05-04-00294-CV, 2005 WL 834098, at *2 (Tex. App.—Dallas Apr. 12, 2005, no pet.) (mem. op.) (concluding plaintiff could not prevail in defamation suit by alleging defendant "committed an offense" under section 261.107 because subsection (c) allows for prosecution of offense only by county prosecuting attorney); *de la Torre v. de la Torre*, 613 S.W.3d 307, 312–13 (Tex. App.—Austin 2020, no pet.) (concluding section 261.107's subsections (d) and (e) pertaining to attorney's fees and $1,000 civil penalty did not create private causes of action and thus appellant lacked standing to claim that relief).

(trial court abuses its discretion when it acts arbitrarily, unreasonably, or without reference to any guiding rules or principles).

In family law cases, the abuse-of-discretion standard of review overlaps with the traditional sufficiency standards of review; as a result, insufficiency of the evidence is not an independent ground of reversible error, but instead constitutes a factor relevant to our assessment of whether the trial court abused its discretion. *In re A.B.P.*, 291 S.W.3d 91, 95 (Tex. App.—Dallas 2009, no pet.). To determine whether a trial court abused its discretion in modifying a parent's possession or access, we look to whether the trial court had sufficient information on which to exercise its discretion and, if so, whether it acted reasonably in applying its discretion based on the information before it. *Id*. An abuse of discretion generally does not occur if some evidence of a substantive and probative character exists to support the trial court's decision. *In re S.M.V.*, 287 S.W.3d 435, 450 (Tex. App.—Dallas 2009, no pet.). Further, because the trial court has "full opportunity to observe witness testimony first-hand," it is "the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014).

"The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child." TEX. FAM. CODE § 153.002. To determine the child's best interest, courts may use the "*Holley* factors," which include, but are not limited to:

(A) the desires of the child;

(B) the emotional and physical needs of the child now and in the future;
(C) the emotional and physical danger to the child now and in the future;
(D) the parental abilities of the individuals seeking custody;
(E) the programs available to assist these individuals to promote the best interest of the child;
(F) the plans for the child by these individuals or by the agency seeking custody;
(G) the stability of the home or proposed placement;
(H) the acts or omissions of the parent which may indicate that the existing parent–child relationship is not a proper one; and
(I) any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors are not exhaustive and not all will apply in every case. *See Interest of L.J.H.*, No. 05-21-00183-CV, 2021 WL 4260769, at *14 (Tex. App.—Dallas Sept. 20, 2021, no pet.) (mem. op.).

The "public policy of this state" is to:

(1) assure that children will have frequent and continuing contact with parents who have shown the ability to act in the best interest of the child;
(2) provide a safe, stable, and nonviolent environment for the child; and
(3) encourage parents to share in the rights and duties of raising their children after the parents have separated or dissolved their marriage.

TEX. FAM. CODE § 153.001(a).

Father contends that even if the trial court had jurisdiction to act under Chapter 261, "legally and factually insufficient evidence exists to support modification" under that chapter. He asserts:

[T]he only information that Father had from the doctor was that the children needed a specific inhaler with a spacer for the last several years. Father also had information that Mother was not using that

–17–

specific inhaler with a spacer and that the child had trouble breathing. Father also believed that not treating the child's asthma correctly could result in death. That the doctor told other people that Mother's treatments were approved does not change the information Father had because the doctor's statements were never relayed to Father. And whatever the doctor told the parent facilitator is ultimately irrelevant because it occurred months after the last report.

Father argues (1) "[t]he Department caseworker testified that she never reported anything Father had said as being untrue"; (2) "[t]he parent facilitator, who was appointed two months after Father's last report, testified that there had been a miscommunication between the children's doctor and Father"; and (3) "[n]either of these statements were ever contradicted at trial."

The record shows the children's physician told Mother, Dr. Robb, and Ms. Burse that the generic inhaler was proper and was not at any time harmful to the child. Though the physician assistant's April 2020 letter possibly caused some understandable confusion, Father repeatedly filed reports alleging the same complaints after multiple investigations showed no wrongdoing by Mother or danger to the children. Ms. Burse investigated the July 2020 report, told Father that after speaking with the children's physician the Department determined there was no wrongdoing, and recommended that Father contact the physician with any questions about "what Mom was doing." Yet Father filed another report the following month. The record also shows Father was angry at Mother and sought to use the children as tools to control and emotionally affect her.

–18–

The trial court had the opportunity to observe Father's testimony and was the sole arbiter of his credibility regarding the reason he continued to file CPS reports. *See In re A.B.*, 437 S.W.3d at 503; *see also In re O.G.*, No. 05-13-01263-CV, 2014 WL 2937176, *2 (Tex. App.—Dallas June 26, 2014, no pet.) (mem. op.) (explaining trial court "is in the best position to observe the demeanor and personalities of the witnesses and can feel the forces, powers, and influences that cannot be discerned by merely reading the record" (cleaned up)). On this record, we conclude the trial court did not abuse its discretion by determining Father made a CPS report that was false and lacked factual foundation. *See* TEX. FAM. CODE § 261.107(b).

Additionally, Father contends the evidence is legally and factually insufficient to support a finding that the trial court's modification of possession and access was in the children's best interest. Specifically, Father complains of the order's provisions that the parties may only communicate via U.S. mail, cannot attend appointments for the children that occur during the other parent's possession periods, and have no duty to inform or consult with each other except to inform the other parent if they reside with a sex offender or person subject to a protective order. Father asserts the order "contradicts all evidence presented to the trial court" and "puts the children in danger because either party can choose to see a different doctor or use different medications for the children, which could significantly impair the children's physical health, and the parent ***is prohibited from telling the other***."

The record does not show the trial court's order eliminated either party's above-described "right of access to medical, dental, psychological, and educational records of the children" or "right to consult with a physician, dentist, or psychologist of the children" other than during appointments. Thus, we cannot agree the order precludes the "possibility of consistency" regarding the children's medical needs or places the children in danger regarding their medical treatment, as Father argues.

Further, though Texas's policy is to "encourage parents to share in the rights and duties of raising their children," the children's best interest "shall always be the primary consideration of the court" in determining possession and access. *See* TEX. FAM. CODE §§ 153.001(a), 153.002. As noted, the record shows Dr. Robb testified (1) he believed the children "have been treated less as children and more as . . . tools to harm, control, or otherwise continue emotional entanglements of some sort with the mother," which could result in "not only immediately emotional harm but long-term emotional harm" to the children; (2) Father appeared to be "stalking the mother," had acknowledged communicating with the children through their bedroom window while in the bushes outside Mother's house, was "treating the mother as the enemy" and as "someone who . . . needs to be fought with rather than co-parented with," and was interfering with the children's appointments with their physicians by cancelling appointments Mother had made; (3) when he suggested other approaches, Father told him "that he was gonna keep doing what he was doing and that was

essentially the right way to handle things"; and (4) he "had significant concerns that Father's lack of insight was going to lead to long-term harm for the children."

Ms. Burse testified (1) Father filed five CPS reports based on Mother's alleged "medical neglect," including after Ms. Burse told him she had spoken to the children's doctor and there was no wrongdoing; (2) Mother told her she "didn't feel comfortable co-parenting due to concerns about her safety with [Father]"; and (3) based on her investigation, she was "concerned that [the children] were being told information that put them in the middle of policing what was happening at Mom's house and . . . reporting back."

Mother testified (1) the children told her Father has come to their window at her home "a lot" and it has "been going on for a long time"; (2) Father has visited her home uninvited on multiple other occasions, sometimes banging on the door and yelling; (3) he gave the children a cell phone and instructed them to hide it from her; (4) he told the children in phone calls "to hold on, it's not that much longer, you know what to do"; and (5) she is concerned about the safety and welfare of the children if Father is allowed unsupervised possession.

That testimony supported a conclusion that the existing parent–child relationship between Father and the children was not a proper one and that Father's parental abilities and actions presented an emotional and physical danger to the children now and in the future. *See Holley*, 544 S.W.2d at 371–72. Additionally, the evidence showed Father's actions had resulted in Father and Mother being unable to

–21–

effectively coparent, including on critical matters such as the children's healthcare. On this record, we conclude the trial court did not abuse its discretion because evidence supports a finding that the complained-of modifications in the trial court's order were in the children's best interest. *See id*.; *see also In re A.B.P.*, 291 S.W.3d at 95.

**The trial court did not err by granting Mother attorney's fees**

Though we generally review a trial court's award of attorney's fees under an abuse of discretion standard, the issue of whether Texas law recognizes a basis for the recovery of attorneys' fees is a question of law we review de novo. *See, e.g., Holland v. Wal-Mart Stores, Inc.*, 1 S.W.3d 91, 94 (Tex. 1999) (per curiam); *In re A.Y.K.*, No. 05-20-00547-CV, 2021 WL 3855632, at *4 (Tex. App.—Dallas Aug. 30, 2021, no pet.) (mem. op.).

Several sections in Title 5 provide a trial court discretion to order attorney's fees. First, "[i]n a suit under this title, the court may render judgment for reasonable attorney's fees and expenses." TEX. FAM. CODE § 106.002(a). Second, if the court finds that a respondent has "failed to make child support payments" or "failed to comply with the terms of an order providing for the possession of or access to a child," the court shall order the respondent to pay the movant's reasonable attorney's fees. *Id*. § 157.167(a)–(b). Third:

> The court may include in a final order in a suit in which a party to the suit makes an allegation of child abuse or neglect a finding on whether the party who made the allegation knew that the allegation was

false. . . . The court may impose on a party found to have made a false allegation of child abuse or neglect any civil sanction permitted under law, including attorney's fees, costs of experts, and any other costs.

*Id*. § 105.006(h).

In his second issue, Father complains of the trial court's attorney's fees award to Mother.[4] The record shows Mother (1) made general requests for attorney's fees in her motion, petition, and responses that were not limited to any specific family code provision and (2) provided a summary of her attorney's fees showing that at the time of trial, she had incurred fees of $10,524.96 for her enforcement action, $34,183.50 for her modification action, and $1,725.00 for defense of Father's enforcement action. The trial court awarded her $46,433.46 in attorney's fees. Though the portion of the trial court's order that describes the false CPS reports states the court "has ordered [Father] to pay the reasonable attorney's fees incurred by [Mother], who was falsely accused of abuse or neglect in the proceedings relating to the false report," the order's fee award appears twenty-nine pages later and states as follows:

> *Attorney's Fees*
> IT IS ORDERED that good cause exists to award [Mother] judgment in the amount of forty-six thousand four hundred thirty-three dollars and forty-six cents ($46,433.46) for reasonable attorney's fees, expenses, and costs incurred by [Mother] as of September 8, 2021, with

---

[4] According to Father, (1) "the trial court explicitly found that it was awarding fees pursuant to Chapter 261 by tracking the Chapter-261 language to award fees"; (2) this constituted error because section 261.107 is inapplicable for the above-described reasons and, regardless, Father does not meet section 261.107(d)'s criteria; (3) "even if the trial court could have awarded fees under another statute, which it did not, those fees were not segregated from the void Chapter 261 fees"; and (4) to the extent the trial court awarded Mother fees under section 157.167 to defend Father's enforcement action, this was improper because that section only allows for attorney's fees to a movant.

interest at 5% percent per year compounded annually from the date the judgment is signed until paid.

Even assuming without deciding that section 261.107(d) cannot support an award of attorney's fees in this case and that section 157.167 cannot support defensive attorney's fees to a respondent, nothing in the trial court's order states that any attorney's fees were based solely on section 261.107(d) or section 157.167. Independent of those provisions, sections 106.002(a) and 105.006(h) provide support for the attorney's fees awarded in this case. *See also Keever v. Finlan*, 988 S.W.2d 300, 306 (Tex. App.—Dallas 1999, pet. dism'd) ("Under a discretionary statute, findings of fact and conclusions of law are neither appropriate nor required."). Thus, the trial court's attorney's fees award to Mother was not improper.

**The trial court erred by awarding Mother seven make-up days of possession**

A "court may order additional periods of possession of or access to a child to compensate for the denial of court-ordered possession or access," which "must be of the same type and duration of the possession or access that was denied." TEX. FAM. CODE § 157.168(a)(1). "When a trial court finds that a parent has withheld possession, it is an abuse of that court's discretion to make an award of possession that is substantially different in duration than that which was withheld." *In re Ramberansingh*, No. 05-13-00558-CV, 2013 WL 3871047, at *1 (Tex. App.—Dallas July 23, 2013, orig. proceeding) (mem. op.).

In his third issue, Father asserts the trial court erred by awarding Mother seven make-up days of possession because Father only withheld the children improperly for four days during the 2020 spring break extension. According to Father, (1) the children's 2020 spring break was originally the week of March 9, so under the decree's spring break provision he was entitled to have the children from the time of the children's school dismissal on Friday, March 6, until Sunday, March 15, at 6 p.m.; (2) the decree also awarded Father possession on Thursdays of each week during the regular school term from the time school was dismissed until the time school resumed the next day and on the first and third Fridays of March 2020 beginning when school was dismissed and ending at 7 p.m. the following Sunday; and (3) the school district extended spring break "through March 16–20," which included the third Friday of that month. Thus, Father contends, he was entitled to three days of possession during the seven-day period in question.

Though Mother does not dispute Father was entitled to the possession he describes during the extended spring break week, she contends "in this case three days of extra time to Mother is in no way extreme or substantially different, is harmless and not reversible error." We cannot agree with Mother that awarding seven make-up days of possession here, thus nearly doubling the amount of make-up days warranted, meets section 157.168(a)(1)'s "same type and duration" requirement. *See* TEX. FAM. CODE § 157.168(a)(1). On this record, we conclude the trial court abused

its discretion by awarding Mother seven make-up days of possession instead of four. *See Ramberansingh*, 2013 WL 3871047, at *1.

We reverse the portion of the trial court's judgment awarding Mother seven make-up days of possession of the children and render judgment that Mother is instead entitled to four make-up days of possession. We otherwise affirm the trial court's judgment.

/Cory L. Carlyle/
CORY L. CARLYLE
JUSTICE

210992F.P05



## Court of Appeals
## Fifth District of Texas at Dallas
### JUDGMENT

IN THE INTEREST OF M.M. AND
M.M., CHILDREN

No. 05-21-00992-CV

On Appeal from the 470th Judicial
District Court, Collin County, Texas
Trial Court Cause No. 470-57144-
2018.
Opinion delivered by Justice Carlyle.
Justices Garcia and Rosenberg
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED** in part and **REVERSED** in part. We **REVERSE** that portion of the trial court's judgment awarding appellee Kelley McCoy seven make-up days of possession of the children and **RENDER** judgment that appellee Kelley McCoy is instead entitled to four make-up days of possession. In all other respects, the trial court's judgment is **AFFIRMED**.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered January 13, 2023